Miyoko Sakashita (CA Bar No. 239639)
Kristen Monsell (CA Bar No. 304793)
Julie Teel Simmonds (CA Bar No. 208282)
CENTER FOR BIOLOGICAL DIVERSITY
1212 Broadway, Suite 800
Oakland, CA 94612
Telephone: (510) 844-7137
Facsimile: (510) 844-7150
Email: miyoko@biologicaldiversity.org
Email: kmonsell@biologicaldiversity.org
Email: jteelsimmonds@biologicaldiversity.org

Deborah A. Sivas (CA Bar No. 135446)
Matthew J. Sanders (CA Bar No. 222757)
Stephanie L. Safdi (CA Bar No. 310517
ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone:  (650) 725.8571
Facsimile:  (650) 723.4426
Email: dsivas@stanford.edu
Email: matthewjsanders@stanford.edu
Email: ssafdi@stanford.edu

*Attorneys for Plaintiffs Center for Biological Diversity, Friends of the Earth and Marcelin Keever*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**(San Francisco Division)**

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, a nonprofit corporation; FRIENDS OF THE EARTH, a nonprofit corporation; and MARCELIN KEEVER, an individual,<br><br>            Plaintiffs,<br><br>        v.<br><br>MICHAEL S. REGAN, in his official capacity as Administrator of the U.S. Environmental Protection Agency, and U.S. ENVIRONMENTAL PROTECTION AGENCY,<br><br>            Defendants. | Case No. 3:23-cv-535<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**<br><br>(Clean Water Act, 33 U.S.C. §§ 1251–1389) |

# INTRODUCTION

1. The U.S. Environmental Protection Agency's (EPA's) failure to address pollution from oceangoing vessels as required by the Clean Water Act has caused significant harm to aquatic ecosystems. One type of vessel pollution, ballast water, is widely recognized as a major pathway for the introduction and spread of aquatic invasive species and human and animal pathogens. Non-native plants and animals, harmful algae, and diseases are carried in ballast water and cause great economic and environmental damage when they are subsequently released into and invade new waters.

2. Once introduced into new waters, invasive species can reproduce and spread rapidly. These invaders have devastated fisheries and caused irreversible environmental harm to coastal and inland waters. For example, zebra mussels from ballast water discharges spread rapidly across the country—from the Great Lakes to the Gulf and western states—in just two decades. Aquatic invasive species cause $9 billion in damages annually to our infrastructure for public water supplies, industry, and energy generation systems.

3. Vessels also routinely discharge oil, grease, detergents, biocides, and other contaminants into U.S. waters from deck washing, emissions scrubbers, plumbing systems, and fish holds.

4. Inadequate regulation of water pollution from vessels puts communities at risk of exposure to contaminated waters and water-borne diseases. These burdens may fall disproportionately on environmental justice communities that lack access to clean water.

5. The Clean Water Act, as amended by the Vessel Incidental Discharge Act of 2018 (VIDA), required EPA to establish standards for ballast water and other incidental discharges by December 4, 2020. 33 U.S.C. § 1322 (p)(4)(A)(i). To date, EPA has not established such standards. Accordingly, EPA missed, and continues to miss, this statutory deadline, and is now over two years late in establishing vessel discharge standards as mandated by Congress.

6. VIDA further requires the U.S. Coast Guard to issue regulations that implement the vessel discharge standards no later than two years after EPA finalizes them. 33 U.S.C. § 1322(p)(5). EPA's delay in issuing the mandated standards has prevented the Coast Guard from proceeding with

this task and has allowed ship pollution to continue to wreak havoc on ecosystems and threaten public health.

7. The Center for Biological Diversity and Friends of the Earth bring this lawsuit to compel EPA to finalize its overdue standards for vessel discharges under the Clean Water Act.

## JURISDICTION, VENUE, AND INTRADISTRICT ASSIGNMENT

8. This case arises under the Clean Water Act, 33 U.S.C. § 1251 *et seq.*, which vests jurisdiction in district courts over challenges to the failure of the administrator of EPA to perform any nondiscretionary act or duty required by the Act and to order the administrator to perform such act or duty. 33 U.S.C. § 1365(a)(2).

9. As required by the Clean Water Act citizen suit provision, Plaintiffs provided Defendants with notice of their intent to sue over the Clean Water Act violations alleged in this Complaint more than 60 days ago. Defendants have not remedied those violations of law.

10. Venue is proper in the Northern District of California because EPA resides in this district, Plaintiff Marcelin Keever resides in this district, and a substantial part of the events giving rise to the claims occurred here, including because EPA's actions and omissions with respect to vessel discharges affect waters in this district. 28 U.S.C. § 1391(e).

11. Pursuant to Civil Local Rule 3-2(c) and 3-2(d), the appropriate intradistrict assignment of this case is either to the San Francisco Division or the Oakland Division.

## PARTIES

12. The CENTER FOR BIOLOGICAL DIVERSITY is a national, nonprofit conservation organization incorporated in California, with an office in Oakland, dedicated to the preservation of biodiversity, native species, and ecosystems. The Center works through science, law, and policy to secure a future for all species, great or small, hovering on the brink of extinction. The Center has over 87,000 members and more than 1.7 million online supporters worldwide. The Center has worked for decades to safeguard water and aquatic habitats for people, plants, and animals. One of the Center's main goals is to protect imperiled species and their habitats. The Center's oceans program works to protect biodiversity and habitat in the oceans and the Great Lakes. The Center has worked for years to protect ecosystems that are threatened by vessel discharges and aquatic invasive species.

13. Center members reside in areas and regularly work in, obtain food and water from, visit, observe, recreate, and otherwise enjoy areas and water bodies across the nation that are or could be impacted by vessel discharges and intend to continue doing so in the future. Plaintiffs' members regularly derive professional, aesthetic, spiritual, recreational, economic, conservation, educational, and other benefits from the natural habitats and wildlife that live in areas adversely impacted by aquatic invasive species, ballast water pollution, and other vessel discharges and intend to continue doing so in the future. The interests of Plaintiffs' members in the species, areas, and water bodies impacted by ballast water and other vessel discharges are and will be directly, adversely, and irreparably affected by Defendants' violations of the law.

14. Center members regularly use and enjoy fish, wildlife, water, and other natural resources in places that are impacted by unregulated discharges from ships, including, but not limited to, coastal areas of Big Lagoon, Humboldt Bay, San Francisco Bay, Monterey Bay, and Santa Cruz. These members rely on these and other coastal areas for a variety of recreational, aesthetic, educational, spiritual, and scientific benefits.

15. For example, Center members enjoy whale watching and other wildlife observation; kayaking in bays and lagoons; hiking coastal trails; surfing; swimming; and exploring tidepools to look for animals like sea stars, anemones, and urchins. The Center and its members also have interests in protecting and recovering delta smelt, longfin smelt, coho salmon, and steelhead, and other imperiled species. These recreational, aesthetic, educational, spiritual, and scientific interests are harmed by invasive species and various pollutants that are in ballast water and other discharges from ships, including oil and grease, heavy metals, and various chemicals and pathogens. These interests would be served if EPA enacts regulations to control and prevent this pollution.

16. Plaintiff FRIENDS OF THE EARTH is a nonprofit environmental organization. It has offices in Berkeley, California, and Washington, D.C., where it is incorporated. Friends of the Earth is a membership organization consisting of over 225,000 members across all 50 states. Additionally, Friends of the Earth has more than 5 million activist supporters on its email list throughout the United States. It is also a member of Friends of the Earth International, which is a network of grassroots groups in 74 countries worldwide. Friends of the Earth's mission is to protect our natural

environment, including air, water, and land, to achieve a healthier and more just world, using public education, advocacy, legislative processes, and litigation. Friends of the Earth is concerned about the adverse environmental impacts of vessels and shipping, among other issues. Friends of the Earth works toward local and national regulation of vessel pollution to protect water quality from ballast water and aquatic invasive species.

17. Members of Friends of the Earth rely on the organization to advocate for measures that protect the environment from vessel pollution and ballast water. They observe wildlife and recreate in areas that are adversely affected by vessel discharges. They have aesthetic, recreational, educational, professional, and spiritual interests in the protection of water quality and aquatic ecosystems. The interests of Friends of the Earth's members are injured by EPA's inaction in promulgating vessel discharge standards.

18. Plaintiff MARCELIN KEEVER is the Oceans and Vessels Program Director for Plaintiff FRIENDS OF THE EARTH. She lives in San Francisco, California, with her spouse and two children. She has always lived near the coast and recreates in the Pacific Ocean, San Francisco Bay, Lake Tahoe, and various other water bodies with her family. She is concerned about the ongoing threats from ballast water discharges and other vessel pollution from ocean-going vessels. She is also aware of the dangers posed by ballast water and other vessel pollution to the waters that she and her family recreate in and utilize for drinking water. Her interests are injured by EPA's inaction in promulgating vessel discharge standards.

19. Plaintiffs and their members are harmed by EPA's failure to issue standards for vessel discharges. EPA's inaction contributes to vessel discharges that pollute the aquatic ecosystems and wildlife in which the Center and Friends of the Earth and their members have an interest. That pollution diminishes water quality and the opportunities that these organizations and their members have to experience, study, and enjoy the aquatic habitat and wildlife where ballast water discharges occur.

20. In addition, EPA's inaction in regulating ballast-water discharges raises the risk of exposure to infection by pathogens introduced in ballast water, from water contact during recreational

activities, wildlife-viewing, citizen science projects, professional research, environmental restoration work, environmental education and other activities.

21. The Center and Friends of the Earth and their members, and their interests in aquatic ecosystems and wildlife, are also adversely affected by the introduction of animal pathogens in ballast water. Those pathogens infect animals, including corals, snails, freshwater mussels, octopus, lobster, marine and freshwater shrimp, sea urchins, marine and freshwater fish, sea turtles, crocodiles, marine and freshwater birds, seals, sea lions, dolphins and whales, and other animals.

22. Plaintiffs commented on the vessel discharge performance standards that EPA has thus far proposed. Specifically, they identified several deficiencies in EPA's proposed standards and recommended changes that would make the standards more protective of water quality. Plaintiffs are harmed by EPA's ongoing delay in promulgating final standards that will protect their interests in preventing harm to aquatic ecosystems from vessel pollution and invasive species. By not promulgating any final standards EPA has illegally shielded its defective proposed standards from judicial review, while keeping in effect identical standards that have already been held to be unlawful.

23. An order from this Court declaring that EPA is in violation of the Clean Water Act and its implementing regulations, and directing EPA to issue lawful ballast water discharge standards by the dates set forth in the Prayer for Relief, will remedy Plaintiffs' injuries. Final standards that comply with the Clean Water Act will help EPA protect water quality as well as reduce the risks and harm from aquatic invasive species.

24. Defendant EPA is a federal agency charged under the Clean Water Act with restoring and maintaining the chemical, physical, and biological integrity of U.S. waters. It is the agency responsible for issuing vessel discharge standards.

25. Defendant Michael Regan is the Administrator of the U.S. Environmental Protection Agency and is sued in his official capacity. Mr. Regan is ultimately responsible for ensuring that EPA complies with and fully implements the Clean Water Act in accordance with Congress's mandates and intentions.

## STATUTORY FRAMEWORK

26. The Clean Water Act is the nation's strongest law protecting water quality. Congress passed it to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. Congress created the Clean Water Act to end water pollution and to protect water quality, which provides for the protection and propagation of fish, shellfish, and wildlife, provides for recreation, and protects public health. *Id.* § 1251(a).

27. To achieve its goal, the Act prohibits the discharge by any person of any pollutants into U.S. waters that is not authorized by a permit. *Id.* § 1311. Only with a water pollution discharge permit may anyone lawfully discharge pollution into U.S. waters. *Id.* § 1342. Permits are to include technology-based effluent limits, as well as more stringent limits when necessary to meet water quality standards. *Id.* §§ 1311-1317; *see also Natural Resources Defense Council v. U.S. Envtl. Prot. Agency*, 822 F.2d 104, 123-24 (D.C. Cir. 1987).

28. EPA issues two types of water pollution permits, individual and general permits. General permits may cover multiple dischargers for a category of similar sources, such as facilities with similar operations and the same types of wastes. 40 C.F.R. § 122.28. EPA has used a general permit for vessel discharges, which are currently regulated by a general permit issued in 2013.

29. In 2018, Congress passed the Vessel Incidental Discharge Act (VIDA), which amended the Clean Water Act with respect to the regulation of incidental vessel discharges from non-military, non-recreational vessels 79 feet or greater in length into waters of the U.S. *See* Pub. Law 115-282 (Dec. 4, 2018). In place of EPA establishing, implementing, and enforcing effluent limits for vessels' incidental discharges through the permit process, the VIDA amendments essentially split these tasks between EPA and the U.S. Coast Guard, with EPA establishing the effluent limits as performance standards, subject to the same Clean Water Act requirements as normal effluent limitations, and the Coast Guard implementing and enforcing the limits established by EPA, through regulations issued by the Coast Guard.

30. To that end, VIDA mandated that, "[n]ot later than 2 years after December 4, 2018"—that is, by December 4, 2020—EPA "shall promulgate Federal standards of performance for marine

pollution control devices for each type of discharge incidental to the normal operation of a vessel." 33 U.S.C. § 1322(p)(4)(a)(i).

31. VIDA also required the U.S. Coast Guard to develop regulations that govern the implementation, compliance, and enforcement of EPA's standards within two years of EPA's promulgation of those standards—that is, by December 4, 2022. *Id*. § 1322(p)(5).

## FACTUAL BACKGROUND

32. Vessel pollution contributes to a range of environmental and public health problems. Pollutants from vessels include aquatic invasive species, oil and grease, toxic chemicals, metals, plastics, and pathogens. Vessel waste streams originate from ballast water tanks, boilers, engine exhaust emission controls, graywater, and other systems. Tens of thousands of domestic and foreign vessels discharge these pollutant streams into our nation's waters.

33. Each year cargo vessels dump about 52 billion gallons of ballast water into U.S. waters, which is a primary pathway introducing invasive species and pathogens into the U.S. Ships fill and discharge tanks with large volumes of water that serve as ballast, in order to adjust buoyancy and trim and compensate for changes in cargo loads. This ballast water, transported across oceans, often carries harmful plants, animals, and pathogens that can and do wreak havoc on local ecosystems, cause irreparable environmental damage, and spread disease. Studies estimate that aquatic invasive species have caused hundreds of billions of dollars of damage globally over the last 50 years.

34. Because invasive non-native species often lack natural predators to control their populations, they can spread quickly and radically transform local ecosystems. Thousands of such non-native species have invaded North American waters, some of which have caused enormous harm. For example, zebra and quagga mussels, native to Russia and Ukraine, spread through Europe and then were carried across the Atlantic in ballast water. Released into the Great Lakes, they became extremely abundant and fouled beaches and boat hulls, clogged pipelines supplying water to cities and power plants, damaged navigational equipment, harmed fisheries, and decimated native mussel populations, with the cumulative economic cost estimated at $3.1 to $5 billion according to EPA's Great Lakes National Program Office. The mussels quickly spread across much of the eastern and

midwestern United States, causing similar types of damage, and in the 2000s showed up in western states.

35. In San Francisco Bay, which is believed to be the most invaded estuary in the world, ballast water is the dominant mechanism introducing new invasive species from overseas. Several species of invasive clams have displaced native species and reduced plankton populations, which form the base of the pelagic food web. These events, in turn, have likely contributed to the endangerment of local fish populations such as the threatened delta smelt, an endemic fish that faces extinction.

36. Water-borne diseases and toxic, bloom-forming algae have also been introduced to new locations through ballast water. Two bacterial pathogens that cause serious and sometimes fatal human disease were found in fish and shellfish in Gulf Coast waters, again introduced by ballast water. In one case, infected Texas oysters, shipped to other parts of the country, caused outbreaks of gastrointestinal disease in 13 states.

37. Because poor and minority communities are often served by substandard water and wastewater treatment systems—as illustrated by recent drinking water crises in Flint, Michigan, and Jackson, Mississippi—there are clear environmental justice implications to EPA's failure to comply with its legal obligations. As is often the case, the greatest risks and impacts from government inaction fall on overburdened environmental justice communities. The people most likely to get sick or die because of EPA's failure to prevent the introduction of waterborne diseases in ballast discharges are people of low wealth and people of color.

38. There are a variety of other harmful pollutants discharged from vessels. Oil, grease, chemicals, and other residues run off from deckwashing, bilgewater, and boiler blowdown. Discharge from exhaust scrubbers often contains oils, polycyclic aromatic hydrocarbons, metals, selenium, and nutrients. Toxic biocides leach from vessel hull coatings and other anti-biofouling systems. Fish holds discharge effluent from dirty ice, organisms, and fish waste. Wastewater from bathing, sinks, and laundry—also called graywater—contains pollutants such as detergents, soaps, nutrients and pathogens. Garbage and plastic debris can also make its way from decks and cargo holds into the ocean and other waters.

39. The 2013 vessel general permit, which in the absence of updated standards still controls, is inadequate to protect the environment and public health. In *Natural Resources Defense Council v. U.S. Envtl. Prot. Agency*, 808 F.3d 556 (2d Cir. 2015), the Second Circuit Court of Appeals held that the 2013 vessel general permit failed to meet the the Clean Water Act's technology and water quality requirements, which Congress enacted to prevent the spread of pollutants including aquatic invasive species and pathogens.

40. At a time when the nation needs strong protections against water pollution and invasive species, EPA is abdicating its duties to promulgate vessel discharge standards to address ballast water and other vessel pollution.

## EPA'S FAILURE TO PERFORM A STATUTORY DUTY

41. For 36 years, EPA unlawfully exempted discharges incidental to the normal operation of vessels from the permitting program. *See* 38 Fed. Reg. 13,528 (May 22, 1973). A federal court of appeals invalidated and vacated the regulation. *Nw. Envtl. Advocates v. U.S. Envtl. Prot. Agency*, C 03-05760 SI, 2006 WL 2669042, at *15 (N.D. Cal. Sept. 18, 2006), *aff'd* 537 F.3d 1006 (9th Cir. 2008). This decision meant that vessels were prohibited from discharging without a Clean Water Act permit.

42. In 2008, EPA issued a vessel general permit. *See* Notice of Availability, 73 Fed. Reg. 79,473 (Dec. 29, 2008). The State of Michigan, environmental groups, and industry groups challenged the 2008 vessel general permit. Michigan and environmental groups settled with EPA, and the Court denied the industry's petition for review in 2011. *Lake Carriers' Ass'n v. EPA*, 652 F.3d 1, 12 (D.C. Cir. 2011).

43. In December 2013, EPA issued a new vessel general permit to replace the expiring 2008 permit. 78 Fed. Reg. 21,938 (Apr. 12, 2013).

44. In 2015, the Second Circuit Court of Appeals held that the 2013 vessel general permit failed to comply with the law. *See generally Natural Resources Defense Council v. U.S. Envtl. Prot. Agency*, 808 F.3d 556 (2d Cir. 2015). A unanimous panel held that EPA, in issuing the 2013 vessel general permit, was arbitrary and capricious for failing to consider a more stringent standard for ballast water, and found that the available evidence showed the 2013 permit's technology-based

effluent limits did not reflect the best available technology. *Id.* at 571. The Court also faulted the permit's exemption of Great Lakes vessels. *Id.* at 577. The Court further held that the 2013 permit's narrative water quality-based effluent limitations did not ensure compliance with water quality standards and that the failure to include monitoring and reporting requirements for those limits was arbitrary and capricious. *Id.* at 578, 584. The Second Circuit remanded the vessel general permit for further proceedings on these issues, but allowed the 2013 permit to remain in place until EPA issued a new vessel general permit.

45. In 2018, two weeks before the 2013 permit was due to expire and a revised vessel general permit was due, Congress enacted the Vessel Incidental Discharge Act of 2018 (VIDA), which amended the Clean Water Act.

46. In place of the Clean Water Act's requirement that EPA issue a new vessel general permit to manage vessel discharges when the existing (2013) permit expired on December 19, 2018, VIDA required EPA to establish vessel discharge performance standards within two years of the date of enactment:

> Not later than 2 years after December 4, 2018, the Administrator, in concurrence with the Secretary . . . , shall promulgate Federal standards of performance for marine pollution control devices for each type of discharge incidental to the normal operation of a vessel that is subject to regulation under this subsection.

33 U.S.C. § 1322(p)(4)(A)(i).

47. Thus, EPA was required to establish standards by December 4, 2020. 33 U.S.C. § 1322(p)(4). The U.S. Coast Guard was required to promulgate regulations governing the implementation, compliance, and enforcement of EPA's standards by December 4, 2022. *Id.* § 1322(p)(5).

48. On October 26, 2020, EPA published a Notice of Proposed Rulemaking in the Federal Register, with a November 25, 2020, deadline for submission of public comments. *See* 85 Fed. Reg. 67,818 (Oct. 26, 2020). The Notice proposed to establish performance standards for the treatment of ballast water discharges that were identical to the standards in the 2013 permit. *Id.* EPA proposed these standards despite the Second Circuit's decision in *Natural Resources Defense Council v. U.S. Envtl. Prot. Agency*, 808 F.3d 556 (2d Cir. 2015).

49. Plaintiffs submitted comments that EPA's proposed performance standards were inadequate for several pollutants, including ballast water, citing the Second Circuit's 2015 decision. The comments also provided recommendations to strengthen the discharge standards for ballast water and other vessel discharges to better protect water quality and aquatic ecosystems.

50. To date, EPA has not issued a final rule establishing standards for vessel incidental discharges, including ballast water discharges. Now more than two years late, EPA has missed, and every day continues to miss, its congressionally mandated deadline to establish vessel discharge standards.

51. By missing (and continuing to miss) its deadline, EPA has delayed (and continues to delay) the development and promulgation of implementing regulations by the U.S. Coast Guard, which were statutorily due no later than December 4, 2022. 33 U.S.C. § 1322(p)(5)(A)(i) (requiring Coast Guard to promulgate implementing regulations no later than two years after EPA promulgates performance standards).

52. EPA is in violation of the Clean Water Act, as amended by VIDA, and must be compelled to promptly issue final vessel incidental discharge performance standards.

## CLAIM(S) FOR RELIEF

### (Violation(s) of the Clean Water Act)

53. Plaintiffs reallege and incorporate the allegations in Paragraph 1 through 52 of this Complaint.

54. The Clean Water Act, as amended by VIDA, mandates that EPA, "not later than 2 years after December 4, 2018, . . . shall promulgate Federal standards of performance for marine pollution control devices for each type of discharge incidental to the normal operation of a vessel." 33 U.S.C. § 1322(p)(4)(A)(i). That deadline, December 4, 2020, has passed.

55. As of the filing of this Complaint, EPA still has not issued federal standards for marine pollution control devices for vessel discharges, including ballast water. EPA is over two years late in issuing these standards. EPA remains in violation of the Clean Water Act, as amended by VIDA, each day that EPA fails to issue federal standards.

56. EPA's failure to issue final standards violates the Clean Water Act, 33 U.S.C. § 1322(p). EPA and the Administrator are in violation of their nondiscretionary duty to promulgate vessel discharge standards.

**PRAYER FOR RELIEF**

For the reasons stated above, Plaintiffs respectfully request that the Court grant the following relief:

1. Declare that Defendants' failure to finalize federal performance standards for vessel discharges violates the Clean Water Act, 33 U.S.C. § 1322(p);
2. Order Defendants to promulgate final federal performance standards for vessel incidental discharges within 60 days of the Court's declaratory judgment;
3. Award Plaintiffs their costs of litigation, including reasonable attorneys' fees; and
4. Grant such other relief as the Court deems just and proper.

DATED: February 6, 2023             CENTER FOR BIOLOGICAL DIVERSITY


By:  */s/ Miyoko Sakashita*
     Miyoko Sakashita


ENVIRONMENTAL LAW CLINIC
Mills Legal Clinic at Stanford Law School


By:  */s/ Matthew J. Sanders*
     Matthew J. Sanders

     *Attorneys for Plaintiffs*